Filed 10/22/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

GIOVANNI ROMMEL ROSSETTI,

    Defendant and Appellant.

</td><td>

A139041

(Contra Costa County
Super. Ct. No. 51309657)

</td></tr>
</table>

**I.**

**INTRODUCTION**

Appellant Giovanni Rommel Rossetti appeals after entering a plea of no contest to driving with .08 percent or higher blood-alcohol content. He also admitted he had three prior convictions for driving under the influence (DUI). (Veh. Code, §§ 23152, subd. (a), 23550.) He claims the court erred in denying his motion to suppress (Pen. Code, § 1538.5), contending that the nonconsensual blood draw taken after his DUI arrest without first obtaining a search warrant violated his rights under the Fourth Amendment of the United States Constitution.[1] He also argues that the blood draw was not performed in a constitutionally reasonable manner. We reject these arguments and affirm the trial court's denial of appellant's motion to suppress.

---

[1] In relevant part, the Fourth Amendment states, " 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .' " (See *Mapp v. Ohio* (1961) 367 U.S. 643, 646, fn. 4.) The purpose of this provision is to protect people from unreasonable search and seizure, and it applies to the states through the Fourteenth Amendment. (*Id.* at p. 650.) The remedy for a violation of the Fourth Amendment is to render inadmissible any evidence seized during the illegal search. (*Id.* at pp. 654-655.)

1

## II.

## FACTS AND PROCEDURAL HISTORY

The statement of facts is taken from the evidence introduced at the hearing on appellant's suppression motion which, as appellant concedes, "is essentially undisputed." At about 1:50 a.m. on November 9, 2011, California Highway Patrol Officer Jason Tyhurst was driving north on Highway 242 in Contra Costa County when he saw a car traveling an estimated 90 miles per hour in a 65 miles-per-hour-zone. The car was weaving out of its lane and crossing into other lanes. After pacing the car for about one-quarter mile to determine its speed, Officer Tyhurst activated his emergency lights.

After the vehicle was stopped, Officer Tyhurst approached the driver, who was later identified as appellant. The officer observed that appellant's eyes were bloodshot and watery, and his speech was thick and slurred. The officer could smell alcohol emitting from the passenger compartment. Officer Tyhurst explained the reason for the stop, requested identification, and asked appellant whether he had been drinking that evening. When appellant was unable to produce identification, Officer Tyhurst directed him to get out of the car.

Officer Tyhurst conducted a series of field sobriety tests. Appellant's performance on these tests was consistent with alcohol impairment. Officer Tyhurst concluded that appellant had been driving while intoxicated and placed him under arrest.

After Officer Tyhurst drove appellant to the California Highway Patrol area office, he advised appellant that state law required a person arrested for DUI to submit to a chemical test, either blood or breath. Appellant refused to take either test. Appellant was then restrained by Officer Tyhurst and three other officers, and his blood was drawn without his consent at 2:38 a.m. by Jonathan Young, a lab technician both state and nationally certified in phlebotomy. Young executed a declaration under penalty of perjury that he drew the blood in a medically approved manner. Officer Tyhurst did not obtain a warrant for the blood draw, even though there was a judge on call, based on his understanding "[w]e're not required to." The results of the blood-alcohol test showed appellant had a 0.19 percent blood-alcohol level, well above the .08 percent legal limit.

Appellant moved to suppress the blood sample taken from him, as well as the observations of and statements stemming from the forcible blood draw and any related evidence. The People filed opposition. On June 10, 1013, the superior court heard and denied appellant's motion. On June 12, 2013, appellant entered a plea of no contest to count two, alleging that he drove with a .08 percent or higher blood-alcohol level, and he admitted three prior convictions. Count one was dismissed. The court placed appellant on probation for five years with the condition that he serve 365 days in county jail. On June 20, 2013, appellant filed a timely notice of appeal.

## III.

## DISCUSSION

### A. Suppression of Blood Test Results

Appellant claims the court erred in denying his motion to suppress because "there was no constitutional justification for the warrantless, forcible draw of blood in this case, when the officer was aware that a magistrate was available to issue a warrant if he applied for one."

" 'In reviewing a suppression ruling, "we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found." ' [Citation.] [¶] Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court." (*People v. Tully* (2012) 54 Cal.4th 952, 979.) We review issues relating to the suppression of evidence derived from police searches and seizures under federal constitutional standards. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1291.)

At the time of appellant's arrest on November 9, 2011, long-standing California law permitted blood testing without a warrant, and without the consent of the person tested, so long as "the procedure (1) is done in a reasonable, medically approved manner, (2) is incident to a lawful arrest, and (3) is based upon reasonable belief the arrestee is intoxicated. [Citations.]" (*People v. Ford* (1992) 4 Cal.App.4th 32, 35.) California

courts, including our Supreme Court, regularly approved warrantless blood draws where these factors were satisfied. (*People v. Superior Court* (1972) 6 Cal.3d 757, 761-765; *People v. Harris* (2014) 225 Cal.App.4th Supp. 1 (*Harris*) [citing numerous California cases for the proposition that a warrant was not required in order for police to conduct a blood draw of a suspect arrested for drunk driving].)

These California cases were derived from *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*), and were based on the presumed exigency created by the dissipation of alcohol levels in the bloodstream. In *Schmerber*, the court upheld a warrantless blood test of an individual arrested for drunk driving. The court did so because the police officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the 'destruction of evidence' [citation]." (*Id.* at p. 770.) Following *Schmerber*, many courts, including those in California, believed a warrant was virtually never required in order for police to conduct a blood draw of a suspect arrested for drunk driving, due to the exigency of the loss of incriminating evidence. (*Harris*, *supra*, 225 Cal.App.4th at Supp. 5 ["California courts uniformly interpreted *Schmerber* to mean that no exigency beyond the natural evanescence of intoxicants in the bloodstream, present in every DUI case, was needed to establish an exception to the warrant requirement. [Citations.]"].)

However, in 2013, over a year after appellant's arrest, the United States Supreme Court clarified *Schmerber*—and dramatically changed the legal landscape in California and many other states—by holding that the natural dissipation of alcohol in the bloodstream does not establish a per se exigency that suffices on its own to justify a warrantless blood draw in every DUI case. In *Missouri v. McNeely* (2013) ___ U.S.___ 133 S.Ct. 1552, 1563 (*McNeely*), the court indicated "while the natural dissipation of alcohol in the blood *may* support a finding of exigency in a specific case, . . . it does not do so categorically." (Italics added.) Instead, "the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." (133 S.Ct. at p. 1568.) The

4

*McNeely* decision concluded that every case involving a warrantless blood draw must be examined on its own facts in light of the totality of the circumstances to determine whether exigent circumstances existed that would justify an exception to the warrant requirement. (133 S.Ct. at p. 1556.) The prosecution must prove there was " 'compelling need for official action and no time to secure a warrant' " in order to justify a warrantless blood draw. (133 S.Ct. at p. 1559, quoting *Michigan v. Tyler* (1978) 436 U.S. 499, 509.)

It has been recognized "*McNeely* thus repudiated the long-standing California interpretation of *Schmerber*." (*Harris*, *supra*, 225 Cal.App.4th at Supp. 6.) Generally, the Supreme Court's new interpretation of the federal constitution must be given retroactive application to pending cases. (*Griffith v. Kentucky* (1987) 479 U.S. 314, 328 ["We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."]."[2]

However, the United States Supreme Court also has recognized an exception for Fourth Amendment search and seizures cases, and will not apply the exclusionary rule as a remedy where the police conducted a search in good faith reliance on binding legal precedent in the jurisdiction where the search occurred. (See *Davis v. U.S.* (2011) ___ U.S. ___, ___; 131 S.Ct. 2419, 2434 (*Davis*).) *Davis* addressed searches conducted prior to *Arizona v. Gant* (2009) 556 U.S. 332, a case holding that police could not automatically search the passenger compartment of a vehicle whenever an occupant was arrested. (*Davis*, *supra*, 131 S.Ct. at pp. 2424–2425.) Recognizing that its prior holding in *New York v. Belton* (1981) 453 U.S. 454, had been widely understood as permitting such searches, the court concluded that the exclusionary rule was not an appropriate remedy for pre-*Gant* searches. (*Davis*, *supra*, 131 S.Ct. at pp. 2428–2429.) The court reasoned that, where the police act in reliance on established legal precedent, suppressing

---

[2] *Griffin* held that the Supreme Court's holding in *Batson v. Kentucky* (1986) 476 U.S. 79, 106 (Marshall, J. conc.), pertaining to the discriminatory use of preemptory challenges, must be given retroactive application.

evidence would not serve the purpose of the exclusionary rule, which is to deter lawless police conduct. (131 S.Ct. at p. 2426.) The court stated that "[e]xcluding evidence in such cases deters no police misconduct and imposes substantial social costs. We therefore hold that when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." (131 S.Ct. at p. 2434.)

Based on the foregoing, the police conduct in this case falls within the parameters of the "good faith" exception to the exclusionary rule. Appellant does not identify any pre-*McNeely* California decision suggesting that, in the circumstances before us, the warrantless nonconsensual blood draw was legally impermissible. As the trial court found, Officer Tyhurst acted in accordance with existing legal precedent and with a reasonable, good faith belief that his actions were consistent with the law because "the applicable law at the time of the arrest [was] that a warrant wasn't necessary for a blood draw." Consequently, despite the change in the law, no " 'appreciable deterrence' " would result from suppressing the results of the blood draw in this case, and the trial court properly ruled this evidence was admissible. (*Davis*, *supra*, 131 S.Ct. at p. 2426.)[3]

In so concluding we reject appellant's claim that *People v. Thompson* (2006) 38 Cal.4th 811, which was the law in California at the time of appellant's arrest, mandates the conclusion that the police officers' actions in this case "were inconsistent with [existing] California law . . . ." In *Thompson*, our Supreme Court upheld a warrantless entry into a residence to arrest the defendant for DUI because his "blood-alcohol level would have diminished while the police sought a warrant . . . ." (*Id*. at p. 825.) However, the *Thompson* court emphasized that it was not holding in every case "that the police may enter a home without a warrant to effect an arrest of a DUI suspect . . . ." (*Id*. at p. 827.) It reaffirmed it was considering the totality of the circumstances to determine whether the

---

[3] Quite recently, the court in *People v. Youn* (2014) 229 Cal.App.4th 571, reached the same conclusion, finding the police "acted in 'objectively reasonable reliance' on binding California precedent" in conducting a warrantless blood draw, and "there was no police culpability." (*Id*. at p. 579.)

6

police conduct was reasonable. (*Ibid.*) Appellant relies on *Thompson* to argue that binding precedent at the time of his arrest required a "totality of the circumstances" approach in assessing the "justification for the warrantless, forcible draw of blood" in this case.

We disagree, and find *Thompson* to be readily distinguishable. *Thompson* involved circumstances where officers entered the defendant's home without a warrant to arrest him. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (*United States v. United States District Court* (1972) 407 U.S. 297, 313.) " '[A] private home [is] where privacy expectations are most heightened' [citation]." (*Kyllo v. United States* (2001) 533 U.S. 27, 33.) Consequently, *Thompson* did not involve what standard applies to government intrusions taking place outside the home, and does not call into question the unbroken line of pre-*McNeely* authority in California authorizing the officers' actions in this case.

### B. Excessive Force

Appellant also claims his constitutional rights were violated because the officers used excessive force in obtaining the blood sample. He argues that the manner in which the blood was taken by the police violated his due process rights and, by extension, his Fourth Amendment rights.

With or without a warrant, the police may not use unreasonable force to perform a search or seizure of a person. (See *Graham v. Connor* (1989) 490 U.S. 386, 397.) In *Carleton v. Superior Court* (1985) 170 Cal.App.3d 1182 (*Carleton*), the court stated: "Law enforcement must act reasonably and use only that degree of force which is necessary to overcome a defendant's resistance in taking a blood sample. Even where necessary to obtain a blood sample police may not act in a manner which will 'shock the conscience.' A defendant's arbitrary refusal to submit to a blood test will not excuse unlawful police conduct." (*Id.* at pp. 1187-1188, fn. omitted.)

The evidence adduced at the suppression hearing reveals that at 2:38 a.m., Officer Tyhurst and three other officers restrained appellant, whom Officer Tyhurst could not subdue alone because appellant was "kicking around and not doing what [he was] told to

7

do." Appellant, who was handcuffed, was forced down on the floor while lab technician Jonathan Young, state and nationally certified in phlebotomy, drew two vials of blood and gave them to Officer Tyhurst. The entire process was videotaped, and took "probably less than 10 minutes, might have even been less than five minutes."

Defense counsel asked the court to review the videotape of the forced blood draw, claiming "[t]his is excessive force." After reviewing the videotape, the court found the police did not use more force than necessary to overcome appellant's resistance. The court indicated, "And I think the video reveals that officer safety was an issue in this case."[4]

The reasonableness of the officers' conduct in this case is demonstrated by comparing it to the forcible blood draw judicially approved in *Carleton*, *supra*, 170 Cal.App.3d 1182. In that case, police also had to obtain blood from a suspect who was resisting. (*Id.* at p. 1190.) The *Carleton* court noted that the use of six officers to restrain Carleton was necessary because he was a threat to the officers' own security. (*Ibid.*) Consequently, in order to draw blood, he was held in a "temporary carotid restraint" position face down on the floor. (*Id.* at p. 1190.) The officers held Carleton's extremities while a registered nurse withdrew his blood. (*Id.* at pp. 1189-1190.) The court held this to be a reasonable blood draw performed in a medically approved fashion. (*Id.* at p. 1191; *People v. Ryan* (1981) 116 Cal.App.3d 168, 183 [evidence that "[defendant] was restrained by five police officers while a technician removed the blood sample from his left arm" without any showing the officers "introduced any wantonness, violence or beatings" constituted valid use of necessary force "to overcome [defendant]'s resistance"].)

---

[4] Although the videotape was marked for identification and was viewed by the trial court prior to making its ruling, it was never formally received into evidence at the suppression hearing. However, it is obvious the videotape was intended by both counsel to be considered as part of the evidence before the trial court in ruling upon the suppression motion and "we do not consider the technical oversight [in failing to formally offer it into evidence] sufficient to disregard" this evidence. (*People v. White* (1963) 222 Cal.App.2d 774, 780.) In this regard, we have reviewed the video and conclude it is consistent with the trial court's findings.

8

By contrast, suppression was ordered in *People v. Kraft* (1970) 3 Cal.App.3d 890, where the defendant refused to submit to a blood test and resisted being taken into the hospital. (*Id.* at p. 895.) Without provocation, one of the officers struck the defendant on the cheek with a closed fist. (*Id.* at p. 896.) Later, as officers tried to carry or lead the defendant to a bed in an examination room, the defendant fell or was pushed to the floor. (*Ibid.*) On the floor, police immobilized him while a physician withdrew blood. (*Ibid.*) One officer testified that he held the defendant's arm while also holding a scissor lock on the defendant's legs. (*Id.* at p. 898.) An officer acknowledged that the defendant's behavior had not been aggressive but was "defensive." (*Id.* at p. 899.) The court concluded that the officers' "strong-arm" tactics were "aggressive beyond all need," and exceeded the limits of permissible force. (*Ibid.*)

The present case bears more resemblance to *Carleton*, *supra*, 170 Cal.App.3d 1182, than it does to *Kraft*, *supra*, 3 Cal.App.3d 890. Appellant was described as "kicking around," so some amount of force was necessary to overcome his resistance and to obtain the blood sample safely. However, unlike in *Kraft*, the police did not gratuitously strike appellant or otherwise engage in unnecessary physical abuse. The officers used no more force than necessary to hold appellant still so the officers would not be endangered while his blood was being drawn. The blood sample was taken by a phlebotomist in a medically reasonable manner. As the Supreme Court stated in *Schmerber*, *supra*, 384 U.S. at page 760, footnote 4, "[i]t would be a different case if the police initiated the violence, refused to respect a reasonable request to undergo a different form of testing, or responded to resistance with inappropriate force. [Citation.]"

Under these circumstances, there is substantial evidence supporting the superior court's conclusion that the force used was reasonable. (See *Carleton*, *supra*, 170 Cal.App.3d at p. 1188 [appellate court "must determine whether there is substantial evidence to support the court's findings the police acted lawfully"].)

9

**IV.**

**DISPOSITION**

The order denying appellant's motion to suppress is affirmed.

_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
RIVERA, J.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Hon. Susanne Fenstermacher |
| Counsel for Appellant: | Law Office of Paul Kleven, Paul Kleven, by appointment of the Court of Appeal under the First District Appellate Project's independent case system |
| Counsel for Respondent: | Kamala D. Harris, Attorney General of California, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Ronald E. Niver, Deputy Attorney General |