Filed 11/26/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BOBBY LYNN JONES,<br><br>        Defendant and Appellant. | A140054<br><br>(Solano County<br>Super. Ct. No. FCR296214) |

Appellant Bobby Lynn Jones was arrested for driving a vehicle under the influence of alcohol and causing injury. Following his arrest, a sample of his blood was taken over his objection and without warrant. His motion to suppress the results of the chemical analysis of his blood sample was denied. Jones contends that the decision of the United States Supreme Court in *Missouri v. McNeely* (2013) ___ U.S. ___ [133 S.Ct. 1552] (*McNeely*), rendered subsequent to his arrest, mandates suppression of the evidence. We disagree and affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On September 21, 2012, shortly before midnight, Fairfield police were called to the scene of a rear-end, two-car collision on Airbase Parkway. The collision had forced the first vehicle off the road and down an embankment, and the driver had sustained soft-tissue injuries for which she sought medical treatment. The other car, a newer model Toyota with major front-end damage, was on the street unattended, with the air bags deployed. The driver of the Toyota had reportedly fled on foot, possibly headed westbound on the north side of Air Base Parkway.

1

At about 12:06 a.m., Jones was observed walking westbound on the north side of Air Base Parkway about 400 yards from the scene of the collision, in an area with no sidewalks and where pedestrian traffic is prohibited by local ordinance (Fairfield Ord. No. 11.6.2). When detained by police, Jones was observed to be disheveled, and he had leaves on his person as if he had come out of the nearby bushes. He appeared to be intoxicated with an alcoholic odor, watery bloodshot eyes, and unsteady gait. Jones denied having been involved in an accident and said that he was walking from Vacaville, a distance of about three miles. Jones admitted that he was on probation, and a records check confirmed that he was on active probation supervision, with terms including a search and seizure condition. A search of Jones's person revealed what appeared to be powder residue from a deployed vehicle airbag on the front of his clothing and a Toyota key in his pants pocket. Officers determined that the key operated the door locks of the Toyota at the crash scene. After a *Miranda* admonishment,[1] Jones admitted that he had been the sole occupant of the Toyota and that a Bluetooth headset found on the floor of the Toyota was his. Jones was arrested.

When advised of the requirement that he submit to a chemical test to determine his blood alcohol content, Jones said that he would not take a blood test. Jones was transported to the Fairfield Police Department for a breath test, but then refused to provide a breath sample. Jones was then taken to the North Bay Medical Center where a blood sample was drawn by a phlebotomist at about 1:10 a.m. Subsequent analysis determined that Jones had a blood alcohol content of 0.25 percent.

Jones was charged by amended information with driving under the influence causing bodily injury (Veh. Code, § 23153, subd. (a); count 1), driving with a blood alcohol level of 0.08 percent causing bodily injury (*Id.*, § 23153, subd. (b); count 2), leaving the scene of an accident involving an injury (*Id.*, § 20001, subd. (a); count 3), and resisting a peace officer (Pen. Code, § 148, subd. (a)(1); count 4).[2] Counts 1 and 2

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

[2] All further undesignated statutory references are to the Penal Code.

alleged a 2006 prior conviction for driving under the influence (Veh. Code, § 23566, subd. (a)). Counts 1 through 3 further alleged that Jones had separately served five prior prison terms (§ 667.5, subd. (b)). The information also alleged Jones was ineligible for a county jail sentence pursuant to sections 1170, subdivisions (f) and (h)(3); and 1385.

Jones's motion to suppress the evidence resulting from the blood draw was denied at his preliminary hearing. Following the preliminary hearing, Jones renewed his suppression motion, arguing that the intervening decision of the United States Supreme Court in *McNeely, supra*, 133 S.Ct. 1552, required a warrant or exigent circumstances for the blood draw. The court conducted a further evidentiary hearing (§ 1538.5, subd. (c)(1)), and denied the motion.

After denial of the suppression motion, Jones entered a plea of no contest to counts 1 and 3 and admitted having served three prior prison terms under section 667.5, subdivision (b), in exchange for an agreed five-year prison sentence. Jones filed a timely notice of appeal, challenging only the denial of his motion to suppress.

## II. DISCUSSION

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

A. *Application of* McNeely

In *McNeely,* the Supreme Court "granted certiorari to resolve a split of authority on the question whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." (*McNeely, supra,* 133 S.Ct. at p. 1558.) McNeely was arrested for driving while intoxicated following a traffic stop and an officer's observations of McNeely's bloodshot eyes, slurred speech, and the smell of alcohol on McNeely's breath. McNeely performed poorly on field-sobriety tests and refused to use a portable breath-test device. (*Id.* at pp. 1556–1557.)

3

Similar to the circumstances here, McNeely refused to provide a breath sample and the arresting officer took him to a nearby hospital for blood testing. At the hospital, McNeely refused to consent to a blood test and the officer then had a hospital lab technician take a blood sample over McNeely's objection. McNeely's blood-alcohol content was above the Missouri legal limit. (*Id.* at p. 1557.) In a decision rendered on April 17, 2013 (*id.* at p 1552), seven months after Jones's arrest, the Supreme Court held that the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every drunk-driving case, and that "the nonconsensual warrantless blood draw violated McNeely's Fourth Amendment right to be free from unreasonable searches of his person." (*Id.* at pp. 1557–1558.) "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." (*Id.* at p. 1561.)

In the case before us, the People presented no evidence of any case specific exigent circumstances in the hearings below, and the trial court made no finding of exigent circumstances. The threshold question then is whether *McNeely* applies retroactively to the search in this case. We hold that it does not.

Prior to *McNeely*, the rule applicable to nonconsensual warrantless blood draws incident to a lawful arrest for driving under the influence was articulated in *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*). Schmerber was arrested at a hospital while receiving treatment for injuries suffered in an accident involving the automobile that he had been driving. (*Id.* at p 758.) He exhibited objective symptoms of intoxication both at the scene of the accident and at the hospital. (*Id.* at pp. 768–769.) In finding a compelled sampling of Schmerber's blood to be a reasonable search and seizure, the court focused on the evanescent nature of alcohol in the body as it is metabolized and the consequent risk of " 'destruction of evidence.' " (*Id.* at pp. 770–771.) The court also found that the test was performed in a reasonable manner by medical personnel. (*Id.* at p. 771.)

"The courts of this state have frequently summarized *Schmerber* as permitting warrantless compulsory seizure of blood for the purpose of a blood-alcohol test if the

4

procedure (1) is done in a reasonable, medically approved manner, (2) is incident to a lawful arrest, and (3) is based upon reasonable belief the arrestee is intoxicated.  (See, e.g., *Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753, 759–760; *People v. Superior Court* (*Hawkins*) (1972) 6 Cal.3d 757, 761; *People v. Fiscalini* (1991) 228 Cal.App.3d 1639, 1642; *People v. Ryan* (1981) 116 Cal.App.3d 168, 182; *People v. Brannon* (1973) 32 Cal.App.3d 971, 974–975.)"  (*People v. Ford* (1992) 4 Cal.App.4th 32, 35–36, parallel citations omitted; see also *Troppman v. Valverde* (2007) 40 Cal.4th 1121, 1136.)

In holding that the natural dissipation of alcohol in the bloodstream, while a factor, does not constitute an exigency in every case sufficient to justify conducting a warrantless blood test (*McNeely, supra,* 133 S.Ct. at p. 1568), the high court noted "the more expeditious processing of warrant applications" (including widespread use of telephonic search warrants since *Schmerber* was decided in 1966), "particularly in contexts like drunk-driving investigations where the evidence offered to establish probable cause is simple."  (*Id.* at pp. 1561–1562, & fn. 4; see *id.* at pp. 1572–1573 (conc. & dis. opn. of Roberts, C. J.).)  *McNeely* requires that the reasonableness of a warrantless blood draw from a suspected drunk driver now be determined on a case by case basis, on its own facts and circumstances.  (*Id.* at p. 1559.)

The trial court found that *McNeely* would have retroactive application to all cases not then final on appeal.  (See *Griffith v. Kentucky* (1987) 479 U.S. 314, 328 (*Griffith*) [a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past].)  *Griffith*, however, did not involve application of the judicially evolved exclusionary rule, but rather the *Batson*[3] requirements for review, at trial, of claims of invidious discrimination in jury selection.  (*Griffith,* at p. 316.)  The exclusionary rule is "a 'prudential' doctrine [citation], created by [the Supreme] Court to 'compel respect for the constitutional

---

[3] *Batson v. Kentucky* (1986) 476 U.S. 79.

guaranty.' [Citations.] Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." (*Davis v. U.S.* (2011) 564 U.S.___ [131 S.Ct. 2419, 2426] (*Davis*).) "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." (*Id*. at p. 2427.) *Davis* recognized a "good-faith" exception to the exclusionary rule and held that where a search is conducted by police officers in objectively reasonable reliance on binding judicial precedent, the conduct of the officers is not wrongful, and that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." (*Id*. at pp. 2428–2429.)

Prior to *McNeely*, all binding judicial precedent in this state, both at the Supreme Court and intermediate appellate levels, consistently interpreted *Schmerber* to permit warrantless blood draws incident to a valid arrest and done in a medically approved manner. (See *People v Harris* (2014) 225 Cal.App.4th Supp. 1, 5 and cases cited therein ["California cases uniformly interpreted *Schmerber* to mean that no exigency beyond the natural evanescence of intoxicants in the bloodstream, present in every DUI case, was needed to establish an exception to the warrant requirement"].) "[W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." (*Davis, supra*, 131 S.Ct. at p. 2429.)[4] *McNeely* affords no basis for exclusion of the evidence here, and the motion to suppress was properly denied.[5]

---

[4] Jones suggests that the "good-faith" rule of *Davis* is inapplicable because the arresting officer relied only on the policy of his police department, testifying that he was aware of Jones's postrelease community supervision status, and that "our policy within the Fairfield Police Department policy [*sic*], it allowed us to do forced blood draws." Jones cites no authority for the proposition that an individual police officer must be able to cite or interpret applicable precedent in order to act in good faith. Law enforcement policies and procedures develop in response to judicial directives, and it is an underlying premise of the prophylactic exclusionary rule that they do so.

[5] Our colleagues in Division Eight of the Second District and Division Four of this District, have recently reached the same conclusion. (*People v. Youn* (2014)

B.    *The Postrelease Community Supervision Search Condition*

The trial court denied the motion to suppress on the basis that Jones was subject to search and seizure without consent at the time of his arrest as a condition of postrelease community supervision (PRCS).[6]  Both the People and Jones agree that no California appellate court has yet considered, in any published decision, whether a warrantless blood draw falls within the scope of a search-and-seizure condition of parole, probation, or PRCS.  We find that it does, and agree that the PCRS terms Jones was subject to provide an independent basis for denial of the motion to suppress.

The evidence presented to the preliminary hearing magistrate and to the trial court showed that Jones acknowledged to investigating officers that he was on active "probation" at the time of his initial detention.  A contemporaneous records check showed that Jones was on PRCS supervision.  The records check also confirmed that Jones was subject to a search condition.  The arresting officer understood from the record confirmation that Jones was on PCRS supervision and testified, ". . . I believe everybody on PRCS usually has a search term.  I haven't come across anyone in my experience beyond [sic] PRCS that does not have searchable probation.  It's like parolees, you're always able to search them."   The trial court took judicial notice of its own records in case No. FCR 296398, which established Jones's PRCS status at the time of his arrest.[7]

PCRS supervision was established as an element of the Criminal Justice Realignment Act of 2011 (enacted by Stats. 2011, ch. 15, §§ 1, 450; amended by Stats. 2011, ch. 361, § 6.7; Stats. 2012, ch. 43, § 27).  The Criminal Justice Realignment Act made significant changes to the sentencing and supervision of persons convicted of felony offenses and shifted responsibility for the custodial housing and postrelease

---

229 Cal.App.4th 571; *People v. Rossetti* (Oct. 22, 2014, A139041) ___ Cal.App.4th ___ [2014 WL 5361334].)

[6] See the Postrelease Community Supervision Act of 2011.  (§ 3450 et seq.)

[7] The materials are not in the record provided to us, and we have no details as to the underlying offense(s) or the terms of the sentence imposed, but Jones makes no challenge to the court's factual finding.

supervision of certain felons from the state to the local jails and probation departments. (*People v. Cruz* (2012) 207 Cal.App.4th 664, 668; *id*. at p. 671.) Under section 3451, low-level offenders serving a prison term who are released from prison, "shall, upon release from prison and for a period not exceeding three years immediately following release, be subject to community supervision provided by a county agency designated by each county's board of supervisors which is consistent with evidence-based practices, including, but not limited to, supervision policies, procedures, programs, and practices demonstrated by scientific research to reduce recidivism among individuals under postrelease supervision." The conditions of supervision are detailed in section 3453, and are imposed without the need for the defendant's agreement. Section 3453, subdivision (f) imposes a mandatory condition, as a term of PRCS release, that "[t]he person, and his or her residence and possessions, shall be subject to search at any time of the day or night, with or without a warrant, by an agent of the supervising county agency or by a peace officer."

Although monitored by county probation officers, a defendant on PRCS is not on probation and PCRS is similar to parole. (*People v. Fandinola* (2013) 221 Cal.App.4th 1415, 1422–1423 [considering postrelease "mandatory supervision" of felon sentenced to serve term in county jail under analogous provisions of § 1170, subd. (h): "a county jail commitment followed by mandatory supervision imposed under [this provision] is akin to a state prison commitment [and] not a grant of probation or a conditional sentence"]; see *People v. Martinez* (2014) 226 Cal.App.4th 759, 762–763.)[8] PRCS does not change any

---

[8] Jones argues that *People v Espinoza* (2014) 226 Cal.App.4th 635 (*Espinoza*) reached a contrary conclusion, holding that a " 'term of imprisonment and parole' does not include PRCS." (*Id*. at p. 638.) *Espinoza*, however, merely noted the differences between PRCS and parole in explaining why the defendant was not entitled to certain custody credits—unlike parole, a felon participating in PRCS cannot be returned to prison for violation of his or her postrelease supervision agreement (§ 3458) and the Department of Corrections and Rehabilitation does not have jurisdiction over persons subject to PRCS (§ 3457). (See *People v. Tubbs* (2014) 234 Cal.App.4th 578.) While not a perfect analog, we agree with *People v. Martinez, supra,* 226 Cal.App.4th at pages 762–763, that PRCS supervision conditions are best analyzed in the context of parole

terms of a defendant's sentence, but merely modifies the agency that will supervise the defendant after release from prison.

"[N]either probationers nor parolees enjoy ' "the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." ' " (*People v. Reyes, supra*, 19 Cal.4th at p. 747 (*Reyes*).) Our Supreme Court has held that a search pursuant to a parole condition, even in the absence of a reasonable suspicion of criminal activity "does not 'intrude on a *reasonable* expectation of privacy, that is, an expectation that society is willing to recognize as legitimate.' " (*Id.* at pp. 751; see also *Samson v. California* (2006) 547 U.S. 843, 852.) "When involuntary search conditions are properly imposed, reasonable suspicion is no longer a prerequisite to conducting a search of the subject's person or property. Such a search is reasonable within the meaning of the Fourth Amendment as long as it is not arbitrary, capricious or harassing." (*Reyes,* at p. 752; See also *People v. Schmitz* (2012) 55 Cal.4th 909, 916; *People v. Smith* (2009) 172 Cal.App.4th 1354, 1360.) Far from being arbitrary, or even absent reasonable suspicion, the search here was conducted on unquestioned probable cause to believe that Jones had been involved in an accident causing injury while intoxicated.

Jones does not contend that the blood draw here was arbitrary, capricious or harassing, and he acknowledges that "the warrantless blood draw conducted in this case does not fall within any of the limitations set forth by the California Supreme Court in *Reyes* and other decisions concerning searches pursuant to conditions of parole and probation." Nevertheless, he argues that, given the nature of the bodily intrusion, a blood draw "would fall outside the parameters of what we ordinarily think the search and seizure clause to entail" and that a nonconsensual blood draw is therefore outside the

---

conditions, since they are imposed involuntarily. An adult probationer *consents* to a waiver of his Fourth Amendment rights in exchange for the opportunity to avoid serving a state prison sentence. (*Reyes* (1998) 19 Cal.4th 743, 749; *People v. Robles* (2000) 23 Cal.4th 789, 795.) PRCS conditions, like parole conditions, are not a matter of choice, and there is no voluntary consent to the conditions.

scope of warrantless searches and seizures permitted to be undertaken against a person on PRCS. He presents no authority for this proposition and fails to persuade us that this is so. He attempts to distinguish clear case authority providing for involuntary collection of bodily fluid samples. Jones suggests that although collection of biological samples for identification purposes may be reasonable under the Fourth Amendment, doing so to collect evidence of a crime mandates review by a neutral magistrate. We find no basis for the distinctions he attempts to draw.

While the compulsory, nonconsensual gathering of biological samples constitutes a search and seizure subject to Fourth Amendment protection, the authorities are consistent in holding that the extraction of biological samples from an adult felon is not an unreasonable search and seizure within the meaning of the Fourth Amendment. (*In re Calvin S.* (2007) 150 Cal.App.4th 443, 446–448 [nonconsensual extraction of the biological samples necessary for DNA testing under § 296[9] is a minimal intrusion into the privacy of the offender], citing *People v. Travis* (2006) 139 Cal.App.4th 1271, 1281–1290, *People v. Johnson* (2006) 139 Cal.App.4th 1135, 1168, *Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 505–506, *People v. King* (2000) 82 Cal.App.4th 1363, 1371–1378; see also *Maryland v King* (2013) ___U.S. ___ [133 S.Ct 1958] [no Fourth Amendment violation when officers take and analyze a buccal swab of a person arrested and detained, on probable cause, for a serious offense].)

Jones argues that a buccal swab may be a minimal bodily intrusion, but that a blood draw is not, and that the Supreme Court in *Maryland v. King* draws this distinction. The Supreme Court did observe that "[a] buccal swab is a far more gentle process than a venipuncture to draw blood." (*Maryland v. King, supra,* 133 S.Ct. at p. 1969.) Nothing in that case, however, suggests that drawing blood in a medically approved manner to

---

[9] Section 296 provides that persons arrested for, or charged with, certain felony offenses must provide "buccal swab samples, right thumbprints, and a full palm print impression of each hand, *and any blood specimens or other biological samples* required pursuant to this chapter for law enforcement identification analysis." (§ 296, subd. (a), italics added.)

obtain evidence of a crime is an inherently unreasonable intrusion, and *Schmerber* and *McNeely* clearly hold otherwise. As the Supreme Court noted long ago in *Schmerber*, "[s]uch tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." (*Schmerber, supra,* 384 U.S. at p. 771.) The drawing of blood is sufficiently routine that it is one of the procedures to which every California driver implicitly consents as a condition of operating a motor vehicle in this state.[10]

In *Maryland v. King*, the Court also observed that " '[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner.' " (*Maryland v. King, supra,* 133 S.Ct. at p. 1969, citing *Schmerber, supra,* 384 U.S. at p. 768.) "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness' " and the reasonableness of any bodily intrusions must be considered in the context of an individual's legitimate privacy expectations. (*Maryland v. King,* at p. 1969.) By virtue of his PRCS supervision conditions, Jones did not have an "expectation of privacy 'society is "prepared to recognize as legitimate." ' " (*Reyes, supra,* 19 Cal.4th at p. 754.)

The purpose of a search condition is to deter the commission of crimes and to protect the public. (*Reyes, supra,* 19 Cal.4th at p. 753.) That purpose was served here. Jones's mandatory PRCS search and seizure condition authorized the blood draw without the necessity of a warrant and offends no interest the Fourth Amendment is intended to protect.

---

[10] The Vehicle Code provides that "[a] person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested for [a driving-under-the influence offense]." (Veh. Code, § 23612, subd. (a)(1)(A).) Consent under California's implied consent law is a factor weighing in favor of the reasonableness of the search. (*People v. Cuevas* (2013) 218 Cal.App.4th 1278, 1286.)

### III. DISPOSITION

The judgment is affirmed.

_____
BRUINIERS, J.

WE CONCUR:


_____
JONES, P. J.


_____
SIMONS, J.

12

Superior Court of Solano County, No. FCR296214, Hon. Peter B. Foor, Judge.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Seth K. Schalit and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.