Filed 4/11/16  P. v. Hill CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C074857 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F05465) |
| v. | |
| RYLAND GEORGE HILL, | |
| Defendant and Appellant. | |

Defendant Ryland George Hill is an admitted alcoholic with a long history of driving while intoxicated.  Defendant was convicted of several drunk driving (DUI) related offenses based on two incidents in July and August 2012.  He also stands convicted of domestic violence which took place during a drunken altercation with his girlfriend before his August DUI arrest.  (Veh. Code, § 23152, subds. (a)-(b), Pen. Code, § 273.5, subd. (a); unless otherwise set forth, statutory references that follow are to the Penal Code.)  He was sentenced to eight years, eight months in prison.

1

On appeal, defendant contends that the court erred in admitting an officer's testimony about the domestic violence incident together with photographs showing his girlfriend's injuries because the officer did not testify at the preliminary hearing and the prosecution never identified the officer as an intended witness in pretrial discovery. He also challenges the constitutionality of a warrantless blood draw from his August DUI arrest, arguing it violated the United States Supreme Court's decision in *Missouri v. McNeely* (2013) --U.S.--, [185 L.Ed.2d 696, 702] (*McNeely*), which found that the natural metabolization of alcohol in the bloodstream, by itself, was insufficient to establish the exigent circumstances exception to the Fourth Amendment's search warrant requirement for blood draws in drunk driving cases.

Finally, defendant claims, and the People concede, that the trial court lacked authority to stay the mandatory four year driver's license suspension imposed by the Department of Motor Vehicles (DMV) under Vehicle Code section 13352, subdivision (a)(7) until after his release from prison. We agree the court erred in staying the DMV license suspension, but otherwise affirm the judgment.

FACTS AND PROCEEDINGS

*July 2012 DUI Arrest*

On July 14, 2012, Sacramento County Sheriff's Deputy John Wilson was interviewing a witness who had reported a shooting incident. While speaking with the witness, Deputy Wilson observed a black Mercedes sedan drive by and fail to stop at a nearby stop sign. The witness said the vehicle might have been involved in the shooting. Deputy Wilson got in his patrol car, turned on his overhead lights and siren, and began pursuing the Mercedes. After committing several more vehicle code infractions, the driver of the Mercedes eventually parked at an apartment complex.

Defendant was driving the car. He smelled of alcohol and had an unsteady gait. He admitted he had been drinking. Deputy Wilson arrested defendant and transported

2

him to the county jail. Although he refused to participate in field sobriety tests at the jail, defendant nevertheless consented to a blood test. Defendant's blood sample contained a .11 percent blood-alcohol concentration.

*Domestic Violence Incident*

Nearly a month after his July DUI arrest, Alvin Green invited defendant and defendant's girlfriend, Alicia Smith, over to his apartment for a social visit. They drank and played dominoes for several hours. Green eventually fell asleep in a recliner. Defendant and Smith were on a nearby couch.

Green awoke to the sound of defendant and Smith fighting. Green saw Smith lying on the couch while defendant was standing next to Smith with his body hunched over her. Defendant was hitting Smith, and Smith was trying to fight back. Green tried to break up the fight by grabbing defendant, but defendant turned and hit Green in the chest. The force of the blow knocked Green to the ground. Green eventually told defendant to leave his house, and defendant left.

Defendant kicked and damaged the front door after Green asked him to leave. A neighbor called the police after hearing Smith yelling for someone to "please call the cops."

Sacramento County Sheriff's Deputy Emmons responded to the 911 call, and spoke with Smith at Green's house. Emmons saw bruises on Smith's face, elbow, wrist, hand, and toe, and took pictures of the bruising.

*August DUI Arrest*

After leaving Green's house in the early morning hours of August 13, defendant drove to his apartment in the same black Mercedes that he had been driving when Deputy Wilson arrested him for DUI a month earlier. Defendant happened to pass Deputy Wilson on the way home. Deputy Wilson recognized defendant's car and knew

3

defendant's license was suspended based on his previous interaction with defendant in July.

Deputy Wilson turned on his overhead lights and tried to stop defendant's car. Defendant, however, only stopped briefly to tell Deputy Wilson he was driving to his apartment and then he continued home. Once at the apartment complex, defendant parked his car and attempted to run into his apartment. Defendant had blood-shot eyes and slurred speech, he was unsteady on his feet, and he smelled of alcohol. He told officers that he sometimes drinks and drives. Defendant refused to participate in field sobriety tests. He was arrested and transported to the North Sacramento CHP station for a blood draw.

Defendant initially refused to cooperate with the blood draw. After officers told him they would forcefully take a blood sample, however, defendant acquiesced. Tests revealed that defendant's blood-alcohol concentration was .17 percent.

*Trial Proceedings*

An October 2012 information charged defendant with two counts of driving under the influence of alcohol (Veh. Code, § 23152, subd.(a), counts 1 and 5), two counts of driving with a blood-alcohol content of .08 percent or higher (Veh. Code, § 23152, subd. (b), counts 2 and 6), and two counts of driving on a DUI-related suspended license (Veh. Code, § 14601.2, subd. (a), counts 3 and 7). The information also charged defendant with both felony and misdemeanor counts for evading a peace officer (Veh. Code, §§ 2800.2, subd. (a) and 2800.1, subd. (a), counts 4 and 8), inflicting corporal injury resulting in a traumatic condition on a cohabitant (§ 273.5, subd. (a), count 9), battery (§ 242, count 10), and vandalism (§ 594, subd. (a), count 11).

The DUI-related charges each included prior conviction allegations. Counts 1, 2, 5, and 6 alleged defendant had three prior convictions for violating Vehicle Code section 23152 within the last 10 years. Counts 3 and 7 alleged defendant had five prior

4

convictions within the last five years for driving on a DUI-related suspended license. The information further alleged that defendant had suffered a prior serious felony conviction for first degree robbery (§§ 1192.7, subd. (c), 211), and that he had served a prior prison term for forgery. (§§ 667.5, subd. (b), 470, subd. (d).) The People later dismissed the prison prior allegation.

Defendant represented himself throughout the proceedings. (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562].) He moved to suppress the results of the warrantless blood draw from the August DUI arrest. The court denied the motion, finding defendant had consented to the search. Even if defendant had not consented, the court concluded *McNeeley* did not apply retroactively and that the officers were operating under a good faith belief that a warrant was not required under the then-existing state of the law.

At trial, the prosecution called two witnesses to testify regarding the domestic violence charge: Alvin Green who witnessed the incident and Deputy Emmons who responded to the 911 call. Green testified that he saw defendant repeatedly hit Smith and that Smith's face was swollen and bruised after the attack. Green was shown two photographs--People's Exhibits 24 and 32. Exhibit 24 showed Smith's bruised face. Exhibit 32 showed Green's damaged front door. The photographic evidence was admitted without objection.

Deputy Emmons was then called to testify about her domestic violence investigation, including several photographs showing Smith's injuries and the damage to Green's door. In addition to the previously admitted People's Exhibits 24 and 32, the other photographs were marked as People's Exhibits 25 through 31. Prior to showing Deputy Emmons the photographs, the prosecutor offered to show them to defendant. Defendant responded, "[a]ctually, I've seen them." The prosecutor then said, "Are you sure?" Defendant told her, "Yeah, I've seen them. I have copies."

After reviewing the photographs, Deputy Emmons testified that the pictures accurately reflected Smith's injuries. When the prosecutor asked the court for permission to publish People's Exhibits 24 through 32 to the jury (even though exhibits 24 and 32 had already been admitted and published without any objection), defendant objected. The objection was based on Deputy Emmons not having testified at the preliminary hearing and because she was not listed on the prosecution's witness list. The prosecutor conceded she had mistakenly forgotten to include Deputy Emmons's name on the witness list, but said Deputy Emmons's report was among the set of documents delivered to defendant during discovery.

When the court asked whether counsel had "some sort of information that will help me decide this issue," the prosecutor stated, "I have my numbered copies of discovery as well as a receipt indicating what pages of discovery Mr. Hill was provided." The court then asked, "All right, and is that report in the pile of documents?" The prosecutor responded, "Yes." Defendant claimed he never received the report, however.

The court overruled the objection, finding the prosecutor had shown that she had discovered the report to defendant as required. Defendant then reiterated that his primary concern was that Deputy Emmons had not testified at the preliminary hearing, and the court told him that testifying at a preliminary hearing was not a prerequisite to testifying as a trial witness. Defendant declined to cross-exam Deputy Emmons.

Except for the vandalism offense, a jury convicted defendant of all charges and found the prior conviction allegations attached to counts 1-3 and counts 5-7 true. In a subsequent bifurcated proceeding, the court found true the prior serious felony conviction allegation.

Defendant was sentenced to eight years eight months in prison, calculated as follows: the upper term of three years, doubled to six years for count 2 (§ 1192.7, subd. (c)); eight months, doubled to 16 months for count 4, and eight months, doubled to 16 months for count 6. The sentences on counts 1 and 5 were stayed under section 654 as

6

they were charged as alternative counts to counts 2 and 6.  The court sentenced defendant to credit for time served on the remaining misdemeanor charges.  Defendant timely appealed.

DISCUSSION

I

*Discovery*

Claiming Deputy Emmons was never listed as an intended trial witness and that he never received any discovery regarding her testimony, defendant argues the prosecutor violated both the state reciprocal discovery statute (§ 1054 et seq.), and the federal constitutional obligation, under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*), to disclose evidence materially favorable to the defense.  He contends the purported discovery violation denied him due process, a fair trial, and the right to confront the witnesses against him.

"The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused.  The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132 (*Zambrano*), disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  "For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness." (*Ibid.*)  "Evidence is material if there is a reasonable probability its disclosure would have altered the trial result." (*Ibid.*)  "[T]he effect of the nondisclosure on defense investigations and trial strategies" are relevant considerations when determining materiality under *Brady*.

"[T]he reciprocal discovery statute independently requires the prosecution to disclose to the defense, in advance of trial or as soon as discovered, certain categories of evidence 'in the possession of the prosecuting attorney or [known by] the prosecuting

7

attorney . . . to be in the possession of the investigating agencies.'  (§ 1054.1.)"
(*Zambrano, supra,* 41 Cal.4th at p. 1133.)  Information and materials subject to
disclosure include the names and addresses of any intended trial witnesses as well as all
relevant real evidence seized or obtained from investigating the offenses charged.
(§ 1054.1, subds. (a), (c).)

If a prosecutor fails to make the required statutory disclosures, and the defendant
has complied with the informal discovery procedures, "a court may make any order
necessary" to enforce the criminal discovery statutes, including, but not limited to,
ordering immediate disclosure, holding contempt proceedings, delaying or prohibiting the
testimony of a witness or the presentation of real evidence, or advising the jury of any
failure or refusal to disclose and of any untimely disclosure.  (§ 1054.5, subd. (b).)
Prohibiting a witness from testifying is warranted only "if all other sanctions have been
exhausted," however.  (§ 1054.5, subd. (c); see also *People v. Gonzales* (1994)
22 Cal.App.4th1744, 1758-1759 [prohibiting a witness's testimony as a discovery
sanction is only appropriate where significant prejudice and willful conduct shown].)

In this case, the record belies defendant's claim that he never received any
discovery regarding Deputy Emmons and her intended testimony.  While it is true the
prosecutor failed to list Deputy Emmons as an intended witness at trial, the record shows
the prosecutor included Deputy Emmons's report and the photographs she took in the
documents given to defendant during discovery.  (See e.g., *Zambrano, supra,* 41 Cal.4th
at p. 1133 [citing prosecutor's representation to court in finding no discovery violation].)
At a reported hearing outside the jury's presence, the following exchange occurred:

"THE COURT:  . . . I do need to -- he's raised this issue about not receiving
something.  I just need to run that to [the] ground.  [¶]  Do you have a [sic] some sort of
information that will help me decide this issue, Counsel?

"[PROSECUTOR]:  I have my numbered copies of discovery as well as a receipt
indicating what pages of discovery Mr. Hill was provided.

8

"THE COURT: All right, and is that report in the pile of documents?

"[PROSECUTOR]: Yes.

"THE COURT: And you are saying you didn't receive it?

"MR. HILL: No, your Honor.

"THE COURT: Well, she's got proof that you did so that objection is overruled as well."

Defendant's own admission that he already had copies of the photographs that Deputy Emmons testified about during trial further buttresses the prosecutor's representation that she in fact had provided defendant with a copy of Deputy Emmons's report and the attached pictures. When the prosecutor offered to show Exhibits 24 through 32 (the photographs of Smith) to defendant prior to questioning Deputy Emmons, defendant said: "Actually, I've seen them." When the prosecutor asked, "Are you sure?" defendant responded, "Yeah, I've seen them. *I have copies.*" (Italics added.)

Thus, contrary to defendant's contention, the record contains more than a mere unsubstantiated representation from the prosecutor that she gave defendant a copy of Deputy Emmons's report as well as copies of the pictures Deputy Emmons took of Smith on the night of the domestic violence incident. Defendant's admission to having copies of the pictures is some proof that he received copies of the disputed discovery before trial.

Because the record contains substantial evidence showing the challenged evidence had been disclosed to defendant prior to trial, the court did not abuse its discretion in refusing to exclude Deputy Emmons from testifying about the pictures. And, because defendant had the opportunity to cross examine Deputy Emmons about the photographs that she took defendant was not denied the right to confront the witnesses against him nor was he denied due process or a fair trial. " 'Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him. [Citation.] *If the material evidence is in a*

9

*defendant's possession* or is available to a defendant through the exercise of due diligence, then . . . the defendant has all that is necessary to ensure a fair trial . . . .' " (*Zambrano, supra,* 41 Cal.4th at p. 1134; original italics omitted, emphasis added.)

Even assuming for the sake of argument that the court erred in allowing Deputy Emmons to testify because the prosecutor did not list her as an intended trial witness under section 1054.1, we conclude the error was not prejudicial. Although defendant surmises he may not have been convicted of the domestic violence charge in the absence of Deputy Emmons's testimony because Smith did not testify, we find other properly admitted evidence amply established defendant's guilt of the domestic violence offense. (*People v. Pinholster* (1992) 1 Cal.4th 865, 941 [defendant bears burden to show that the failure to timely comply with any discovery order is prejudicial], disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Defendant was convicted of violating section 273.5, subdivision (a), which criminalizes the willful infliction of corporal injury resulting in a traumatic condition upon a cohabitant. (§ 273.5, subd. (a).) A person "willfully inflicts" such an injury when a direct application of force by the person upon the victim causes the injury. (*People v. Jackson* (2000) 77 Cal.App.4th 574, 580.) For purposes of section 273.5, bruising constitutes a "traumatic condition" (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1085), and the term "cohabitant" is interpreted broadly to refer to an unrelated couple living together in a substantial relationship with sexual or amorous intimacy. (*People v. Belton* (2008) 168 Cal.App.4th 432, 437-438 [defining "cohabitant"].)

Here, the testimony of Alvin Green established the elements of section 273.5. Green testified that he had been friends with defendant for about two years, and that defendant and Smith lived together and were boyfriend and girlfriend in August 2012. The night of the incident Green saw defendant repeatedly strike Smith with his hands, and her face was swollen and bruised after the altercation.

The jury reasonably could have relied on Green's uncontradicted testimony to convict defendant of violating section 273.5. Even without Deputy Emmons's testimony, then, the result would have been the same. (*Zambrano, supra,* 41 Cal.4th at p. 1135, fn. 13 [violation of California's reciprocal discovery statute subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836; reversal required only where it is reasonably probable that the omission affected the trial result].) Any alleged error in allowing Deputy Emmons's to briefly testify about the photographs of Smith was therefore harmless.

II

*Warrantless Blood Draw*

The Fourth Amendment to the United States Constitution protects an individual's right to be secure in his or her person against unreasonable searches and seizures. (U.S. Const., 4th Amend.; *Terry v. Ohio* (1968) 392 U.S. 1, 8-9, [20 L.Ed.2d 898].) A defendant may move to suppress evidence obtained as a result of an unreasonable search or seizure. (§ 1538.5, subd. (a)(1)(A).) Defendant contends officers violated his Fourth Amendment rights when they took a blood sample over his objection and without a warrant following his August DUI arrest. He claims the United States Supreme Court's decision in *Missouri v. McNeely* (2013) --U.S.--, [185 L.Ed.2d 696] (*McNeely*), mandates that the blood draw results be suppressed. Because the court denied his motion to suppress the evidence, defendant insists reversal is required. We disagree.

In *McNeely*, the Supreme Court "granted certiorari to resolve a split of authority on the question whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." (*McNeely, supra,* 185 L.Ed.2d at p. 703.) The court held that "while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case . . . it does not do so

11

categorically." (*Id.* at p. 709.) Instead, "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." (*Ibid.*)

Prior to *McNeely*, the rule applicable to nonconsensual warrantless blood draws incident to a lawful arrest for driving under the influence was articulated in *Schmerber v. California* (1966) 384 U.S. 757 [16 L.Ed.2d 908] (*Schmerber*). *Schmerber* upheld a warrantless, forced blood draw during a DUI investigation where the officer was confronted with an emergency making it unfeasible to obtain a warrant before the defendant's blood-alcohol dissipated, and where the blood draw was performed according to accepted medical practices. (*Schmerber*, at pp. 770-772.)

At the time of defendant's arrest in August 2012, *Schmerber* had uniformly been interpreted by the courts of this state to mean that no exigency beyond the natural evanescence of intoxicants in the bloodstream was needed to establish an exception to the Fourth Amendment's warrant requirement. (See e.g., *Rossetti*, *supra*, 230 Cal.App.4th 1070 and cases cited therein.) Instead, "California law permitted blood testing without a warrant, and without the consent of the person tested, so long as 'the procedure (1) is done in a reasonable, medically approved manner, (2) is incident to a lawful arrest, and (3) is based upon reasonable belief the arrestee is intoxicated.' " (*People v. Rossetti* (2014) 230 Cal.App.4th 1070, 1074 (*Rossetti*).) It has thus been recognized that *McNeely* " 'repudiated the long-standing California interpretation of *Schmerber*.' " (*Rossetti, supra,* 230 Cal.App.4th at p. 1075.)

Generally, a new interpretation of the federal constitution like the one in *McNeely* is applied retroactively to pending cases. (*Rossetti, supra,* 230 Cal.App.4th at p. 1076, citing *Griffith v. Kentucky* (1987) 479 U.S. 314, 328 [93 L.Ed.2d 649] ["We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past"].) Defendant

12

thus contends his warrantless blood draw results should have been excluded as his case was pending when the Supreme Court rendered its decision in *McNeely*.

The exclusionary rule is a prudential doctrine created by the Supreme Court to compel respect for the Fourth Amendment's constitutional guarantee to be free from unreasonable searches and seizures. (*People v. Jones* (2014) 231 Cal.App.4th 1257, 1264 (*Jones*); *Davis v. U.S.* (2011) 564 U.S. 229, -- [180 L.Ed.2d 285, 293] (*Davis*).) Exclusion is not a personal constitutional right, nor is it designed to redress the injury an unconstitutional search causes. (*Davis*, at p. 293.) "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." (*Id.* at p. 294.)

The Supreme Court, moreover, has recognized an exception to the exclusionary rule in search and seizure cases and will not apply it as a remedy where the police conducted a search in good faith reliance on binding legal precedent in the jurisdiction where the search occurred. (*Davis, supra,* 564 U.S. 229, -- [180 L.Ed.2d at p. 301].) Under such circumstances, suppressing evidence would not serve the exclusionary rule's purpose, which is to deter lawless police conduct. (*Id.* at p. 293.) That principle applies here.

We conclude, as the trial court did below and as other courts have recently concluded (see *Rossetti, supra,* 230 Cal.App.4th at pp. 1076-1077; see also *Jones, supra,* 231 Cal.App.4th at pp. 1264-1265), that the good faith exception to the exclusionary rule governs this case. Excluding the results of defendant's blood test serves no legitimate purpose as it would not deter lawless police conduct since the officers relied on legal precedent when they compelled defendant to provide the blood sample.

Because we conclude the police conduct here falls within the parameters of the "good faith" exception to the exclusionary rule, we need not consider defendant's other contentions that the trial court erred in finding he consented to the blood draw and that no exigent circumstances justified the warrantless search.

13

## III

### *License Suspension*

The jury convicted defendant of multiple violations of Vehicle Code section 23152. Based on these convictions and citing Vehicle Code section 13352, the court revoked defendant's driving privileges for four years. The court, however, stayed the revocation until defendant was released from state prison. Defendant contends, and the People concede, that the trial court lacked authority to stay the four-year license revocation under Vehicle Code section 13352. We agree.

Vehicle Code section 13352 provides that the Department of Motor Vehicles (DMV) "shall immediately suspend or revoke the privilege of a person to operate a motor vehicle upon the receipt of an abstract of the record of a court showing that the person has been convicted of a violation of Section 23152 . . . ." (Veh. Code, § 13352, subd. (a).) Because defendant had suffered three or more previous DUI convictions within the preceding 10 years, the statute imposed a mandatory four year revocation period. (Veh. Code, §§ 13352, subd. (a)(7), 23550.)

The revocation provisions of Vehicle Code section 13352 are an administrative suspension and not a penal sanction. (*Brierton v. Department of Motor Vehicles* (2006) 140 Cal.App.4th 427, 436 (*Brierton*); see also *Larsen v. Department of Motor Vehicles* (1995) 12 Cal.4th 278, 286, fn. 6 [citing multiple cases where the DMV's suspension of license constitutes a civil rather than penal sanction].) The legislative scheme regarding license revocations " ' "contemplate[s] two processes--one involving court proceedings and criminal in nature, the other involving administrative proceedings and civil in nature; and . . . these processes are, for the most part, intended to operate independently of each other and to provide for different dispositions." ' " (*Brierton* at p. 436.)

Because Vehicle Code section 13352 expressly directs the DMV to "immediately suspend or revoke" defendant's license for four years upon receiving the abstract of

14

judgment in this case, the court lacked authority to stay the effective date of the revocation until after defendant completed his prison sentence, resulting in an unauthorized sentence which we may order corrected. Consequently, we modify the judgment accordingly. (*People v. Davis* (1981) 29 Cal.3d 814, 827, fn.5 [imposition of a sentence for which there is no statutory authority is jurisdictional error]; *People v. Talibdeen* (2002) 27 Cal.4th 1151, 1156-1157 [appellate court can correct unauthorized sentence raised for first time on appeal].)

DISPOSITION

The judgment is modified to show defendant's driving privileges shall be revoked or suspended in accordance with the provisions of Vehicle Code section 13352. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and to forward a certified copy thereof to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


       HULL       , J.


We concur:


     BLEASE     , Acting P. J.


     NICHOLSON    , J.


15