Filed 12/23/15

**CERTIFIED FOR PARTIAL PUBLICATION**<sup></sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B259665 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA058121) |
| v. | |
| MARVIN TRAVON HICKS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Kathleen Blanchard, Judge.  Affirmed.

Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

---

<sup></sup>      Pursuant to California Rules of Court, rules 8.110 and 8.1110, this opinion is certified for publication with the exception of **BACKGROUND and DISCUSSION, parts A and B.**

## INTRODUCTION

Defendant and appellant Marvin Travon Hicks (defendant) was convicted of second degree murder (Pen. Code, § 288.7, subd. (a)[1]) in connection with a vehicular death. At his first trial, defendant was convicted of gross vehicular manslaughter while intoxicated, and the jury deadlocked on the charge of second degree murder. At the second trial for second degree murder, the trial court refused to advise the jury that defendant had been convicted of gross vehicular manslaughter, a lesser related offense, in his first trial. We hold in the published portion of this opinion that the trial court did not err in refusing to give that advisement and affirm the judgment.

## BACKGROUND

### A. Factual Background

#### 1. *Prosecution Evidence*

##### a) The Events Related to the Fatal Vehicle Accident

On December 6, 2012, Kim Thomas and John Alvarez saw defendant driving a black Toyota in a reckless fashion on public streets in the City of Lancaster. Thomas testified that a black Toyota stopped approximately "two car lengths before [a] stop sign"; the driver of the vehicle appeared to talk to someone, even though no one else was in the vehicle; the driver went forward, stopped abruptly, and then made a turn at a "high rate of speed"; the vehicle traveled at approximately 25 miles an hour and other cars were passing it; the vehicle sped by Thomas's car at a "high rate of speed"—estimated to be 65 or 70 miles an hour; the vehicle was stopped and blocked traffic lanes; the driver exited the vehicle and pushed it while appearing to talk to himself and wave his hands; and the

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

driver hit and kicked the vehicle, entered the vehicle, and then drove it at a "pretty fast" rate of speed.

Alvarez testified that the black Toyota blocked traffic; passed Alvarez's vehicle at a high rate of speed; and went into the lanes of oncoming traffic attempting to pass cars. Alvarez called 911 and reported that there was a "fairly reckless driver on Sierra Highway," and that the vehicle was "actually crossing the double yellow line into oncoming traffic."

At approximately 5:00 p.m., Los Angeles County Sheriff's Deputy Thomas Kim was driving in an unmarked detective's car, traveling northbound on the Sierra Highway. Deputy Kim looked in his rear view mirror and saw a black Toyota approaching at "a high rate of speed"—estimated at over 100 miles an hour—and allowed the vehicle to pass him. Deputy Kim saw the Toyota enter the lanes for oncoming traffic for approximately three seconds in order to pass vehicles. Deputy Kim accelerated to 70 to 75 miles an hour but was unable to pass the vehicles that defendant had passed. Deputy Kim said that the Toyota ran a red light without the brake lights appearing lit, causing some cars that had entered the intersection to quickly apply their brakes. Deputy Kim broadcasted over his radio, "I just had a car [that he described as a "black Toyota Solara two door"] blow past me going over 100 miles an hour driving on the wrong side of the street and blowing red lights, and going northbound on Sierra Highway just north of Avenue K."

Los Angeles County Sheriff's Sergeant Eric Eitner was off duty and in a personal vehicle on Avenue J. He testified that a black car driving northbound on the Sierra Highway went through an intersection at approximately 100 miles an hour and did not appear to have its brakes applied. He said that there was "a lot of traffic out there," and several drivers belatedly applied their brakes.

Los Angeles County Sheriff's Deputy Gustavo Munoz responded to a dispatch about the black Toyota. Deputy Munoz and his partner, Los Angeles County Sheriff's Department Deputy Giovanni Lampignano, were in a marked patrol car.

3

Deputy Lampignano saw a black Toyota run a red light at a high rate of speed, lose traction, and come to a stop on the southbound curb of the road. Deputy Lampignano activated the lights and sirens on the patrol vehicle and positioned it behind the Toyota.

Deputy Lampignano gave defendant commands, and defendant gave the deputies a "blank stare" and growled at them. Defendant then restarted his car, accelerated, and sped off. He attempted to make a left turn and was accelerating and braking "real quickly" in a jerking motion. A motorcyclist "almost lifted his bike to get it out of the path" of defendant's vehicle.

Deputy Lampignano had to "jump" back into the patrol car because defendant's vehicle came within two feet of him at a "high rate of speed." The deputies pursued defendant in their patrol car, activating the light and sirens. On three occasions, defendant veered into oncoming traffic for a few seconds, requiring cars to swerve to avoid collisions with the Toyota. Defendant ran a red light, and thereafter the deputies lost sight of the Toyota.

Candyce Bailey was on Avenue I traveling eastbound, and as she waited to make a left turn into a shopping center, she saw a dark sedan coming towards her. The car then veered around Bailey, coming within two or three inches of her vehicle. A short time later, she saw a police car in pursuit of a Toyota followed by five or six police cars with the lights and sirens activated.

At about this time, Tina Ruano and her daughter, Madison Ruano,[2] were in Tina's blue Lexus. Tina approached the intersection of 10th Street West and Avenue I; the traffic light was red. When the light turned green, Tina entered the intersection. She does not remember anything that happened next "other than a black car coming from by right side . . . ." Defendant's Toyota had been in a violent collision with Tina's Lexus. Tina regained consciousness while she was being taken to a hospital in an ambulance.

---

[2]     Because Tina Ruano and Madison Ruano share the same surname, we refer to them by their first names. The parties agree that Madison was two years old at the time of the incident.

4

Samuel James Ouart was near the intersection of 10th Street and Avenue I, and saw a car get hit by a black car at the intersection. Ouart described the collision as sounding like a "big explosion," said the black car appeared to be going 80 to 100 miles per hour when it crashed, and saw approximately six patrol vehicles about 20 to 30 seconds after the crash. Ronda Perez, who was also near the intersection, described the collision as an "explosion," and saw the Toyota go "air borne into a light pole."

Deputies Lampignano and Munoz approached defendant's vehicle and ordered him to keep his hands where the officers can see them. In response, defendant "just" screamed, laughed, and talked to himself. The deputies who were with Deputy Munoz extracted defendant from his vehicle.

Los Angeles County Sheriff's Deputy Amos Cisneros, Jr. approached defendant. Defendant was "rigid," "very tense," and "unintelligible." Defendant was resisting the attempts of deputies to extract him from his vehicle.

As a result of the accident with defendant, two-year-old Madison died from "multiple blunt force injuries." The first two vertebrae in her neck were "fracture[d] and separat[ed]" from each other, causing the spinal cord to be "severed" from the brain—a "functional decapitation." Madison also had suffered a "basal or skull fracture" on the right side, lacerations to the liver and spleen, a fracture of the first rib on the right side, and a partially collapsed lung.

b) Treatment of Defendant at Scene and at the Hospital

Adam Moore, an emergency medical technician (EMT), rendered aid to defendant at the scene of the accident. Based on the Glasgow neurological scale test, Moore opined that defendant had a normal level of consciousness. Based on the "Alert and Oriented Times 3" scale, Moore said in his opinion that defendant was alert and oriented. Defendant stated that he was aware of the collision, wearing a seatbelt, ran through a red light, and had no pain.

At 5:32 p.m., defendant was taken to Antelope Valley Hospital and arrived there at 5:38 p.m. Los Angeles County Sheriff's Deputy Amy Smith followed defendant's

ambulance to the hospital. Defendant would "go back and forth" between being "extremely agitated and combative" to "calm and [just] lying there. According to Deputy Smith, "[I]t was scary." At that time, defendant said that he did not understand why he had been transported to the hospital.

Sarah Wozniak-Smith, a phlebotomist, drew defendant's blood. Defendant was "[v]ery combative" during the blood draw; he was "cussing and swearing," "very non-cooperative," and "his hands and feet were moving all over the place." Four people held down defendant so that Wozniak-Smith could draw defendant's blood. A restraint was ultimately placed on defendant so that he could be treated.

Defendant's blood tested positive for marijuana and PCP. David Vidal, a retired senior criminalist with the Los Angeles County Sheriff's Department, testified that the amount PCP detected in defendant's system indicated that it was ingested a few minutes to 48 hours before the blood draw.

Defendant was given the Glasgow test to determine "the neurologic status of an individual" based on eye movement, responses to verbal questions, and motor function. A person who is "completely awake and normal" would score a 15 on the test. Upon arrival at the hospital, defendant scored a 13 on the test, and upon his discharge from the hospital, he scored a 15 on the test. Defendant was transported to the jail and was booked.

c)      Accident Reconstruction

Los Angeles County Sheriff's Detective Michael Politano, the prosecutor's accident reconstruction expert, responded to the accident scene and examined the vehicles involved. Detective Politano testified that the black Toyota did not have any mechanical problems, and opined that the black Toyota was driving west and hit the right side of the Lexus. He concluded that the minimum speed of the Toyota at the time of the accident was 70 miles per hour (mph), and the Lexus was traveling at 16 mph.

6

d)          Expert Testimony Regarding Defendant's Drug Use

Vidal testified as the prosecutor's expert on PCP and its effect on the body. Vidal testified that a person under the influence of PCP would exhibit nystagmus, muscle rigidity, and a "wide range of other physiological phenomenon," such as profuse sweating. People under the influence of PCP can be "extremely agitated," and exhibit "very violent behavior," a "vacant" or "blank stare," and "[r]epetitive speech." The length of influence varies from person to person, but the length is usually three to five hours. Vidal said in his opinion defendant may have ingested PCP within 48 hours of the blood draw.

According to Vidal, PCP could impair a person's ability to operate a car safely. The "ability to process data from multiple sources" is affected by PCP, and because driving requires a person to "take data from a whole bunch of different places" and integrate that information, the ability to drive safely is affected. PCP also disrupts time and distance perception.

California Highway Patrol Officer Joshua Wupperfeld testified as the prosecutor's drug recognition expert (DRE)—"an officer who is trained in detecting a person who is impaired or under the influence of . . . drugs or alcohol." He became a DRE in 2005 and has conducted thousands of driving under the influence (DUI) investigations and DRE evaluations.

Officer Wupperfeld opined that PCP impairs the ability of a person to drive. A person under the influence of PCP "cannot safely operate a motor vehicle." Driving a vehicle requires multitasking, and the use of PCP "severely, severely diminishe[s]" a person's ability to multi-task." PCP also impairs the ability of a person to drive because it causes mental impairment, "aggressiveness," and hallucinations.

Officer Wupperfeld opined that a hypothetical person exhibiting defendant's behavior on the day of the accident was consistent with that person's use of PCP. According to Officer Wupperfeld, people under the influence of PCP are capable of making a decision. Although they might be more likely to make bad decisions, this did not mean that "they're not capable of making a decision."

7

### e) Defendant's Prior Convictions and Other Evidence

On June 1, 1995, defendant pled no contest to a violation of Vehicle Code section 23103, and was ordered to complete an alcohol and drug education program. On August 31, 2001, defendant pled no contest to driving under the influence of drugs or alcohol in violation of Vehicle Code section 23152, subdivision (b), and was ordered to participate in a program pursuant to Health and Safety Code section 11837.

The programs defendant was required to attend as a result of his convictions included the effect of alcohol and drugs on the body and brain and the dangers of driving under the influence of alcohol and drugs. The programs included a showing of "Red Asphalt," a "graphic" documentary showing actual traffic collisions involving impaired drivers.

Defendant had signed a driver's license form in which he certified that he was "advised that being under the influence of alcohol or drugs or both, impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both. [¶] If I drive while under the influence of alcohol or drugs or both and as a result, a person is killed, I can be charged with murder."

### f) Defendant's Testimony from the First Trial

The prosecutor read into evidence portions of defendant's testimony from the first trial. At the first trial, defendant testified that he was the driver of the Toyota and responsible for the accident on December 6, 2012.

At least prior to 1995, defendant knew it was dangerous to drive under the influence of alcohol or drugs from "just living in society." Defendant realized people could be killed by someone driving under the influence of alcohol or drugs.

Defendant admitted that in 1995 he suffered a "wet reckless" conviction and attended a three-month counseling program. Defendant also admitted that in 2001, he was convicted of driving under the influence. In that case, defendant rear-ended a car on the freeway. Because of the accident, defendant again knew that there was a danger that

8

injury or other consequences could be caused by driving under the influence of drugs or alcohol. Defendant was required to attend an 18-month program that included the topic of the dangers of driving under the influence. Defendant had watched graphic videos of people who were injured or killed as a result someone driving under the influence.

Defendant said that between 2011 and December 2012, he used PCP 10 to 15 times, and each time he felt the effects of it. On October 30, 2011, he was hospitalized for one day because he consumed PCP, and on November 8, 2011, he was arrested and booked for being under the influence of PCP. According to defendant, although the amount of time it took for the PCP to affect him varied, the effect was "pretty sudden" and could happen within a minute and last for several hours.

On December 6, 2012, after having breakfast, defendant decided it was a "good time" to smoke a marijuana cigarette laced with PCP. Defendant fell asleep for a few hours and woke up around 3:30 or 4:00 p.m. Defendant admitted that he "made a conscious decision to go and retrieve [his] keys [from the counter] to go and drive" the Toyota. He entered in his car and put the keys in the ignition. He admitted that he "made [the] decision to start [his] car . . . ." In 2012, he knew what could happen when a person drove while under the influence; he knew that lives can be lost and that people's families can be destroyed.

### 2. *Defendant's Evidence from the Second Trial*

Defendant testified that in 1995, he was convicted of "alcohol related reckless driving" and was required to attend a three-month drug and alcohol program. He was convicted in 2001 of DUI arising from an incident in which he rear-ended another vehicle on the freeway resulting in injuries. From that accident, defendant was "put on notice" that driving while impaired was "incredibly dangerous." Defendant was required to take an 18-month course.

In 2011, defendant started using PCP. From approximately April 2011, to the day of trial, defendant had used PCP 10 to 15 times. Defendant would get high on PCP within a minute or so and that high could last for hours.

9

Defendant admitted that on November 8, 2011, he was arrested for being under the influence of PCP, and that on November 12, 2011, he may have been intoxicated with PCP when he broke a garage door lock. Defendant realized there were consequences from using PCP.

On December 6, 2012, defendant had "no plans for the day." At about 10:30 or 11:00 a.m., defendant ingested PCP by smoking it on a marijuana cigarette. Defendant had a "bad trip" and felt different. He heard loud voices, and felt as if he was being "compressed," "pushed and pulled." Defendant went to sleep until approximately 4:00 or 4:30 p.m. When he awoke, he "[s]till felt real weird," was still hearing voices, and had the feeling of being compressed. Defendant tried to call his son, but defendant was unsuccessful in contacting him.

Defendant decided to go to his son's house. Defendant "grab[bed] his keys, entered his car, and headed to his son's house. Defendant testified that he did not remember starting his car, driving, being involved in an automobile accident, being transported in the ambulance, having a blood draw at the hospital, being booked into jail, or being interviewed at the police station. His next memory was waking up in county jail the following day.

Defendant testified that when he drove his car, intending to go to his son's house, he made the decision to drive while he was under the influence. Defendant did not "process everything [that he] had learned in the past," or weigh "the good and the bad" when he entered the car to drive to his son's house the day of the incident.

### B. Procedural Background

The District Attorney of Los Angeles County filed an information charging defendant with murder in a violation of section 187, subdivision (a) (count 1), evading an officer causing injury in violation of Vehicle Code section 2800.3, subdivision (a) (count 2), evading an officer causing death in violation of Vehicle Code section 2800.3, subdivision (b) (count 3), gross vehicular manslaughter while intoxicated in violation of

10

section 191.5, subdivision (a) (count 4), and driving under the influence causing injury in violation of Vehicle Code section 23153, subdivision (a) (count 5).

Following a trial, the jury found defendant guilty of counts two, three, four, and five. The jury was unable to reach a verdict on count 1,[3] and a mistrial was declared as to that count. After a retrial, a second jury found defendant guilty of second degree murder.

The trial court sentenced defendant to state prison for a term of 22 years to life, consisting of term of 15 years to life on count 1, and seven years on count 2. The sentences for counts 3 and 4 were stayed pursuant to section 654. The conviction in count 5 was reversed because it was necessarily included in the count 4 offense. Defendant filed a timely notice of appeal.

## DISCUSSION

### A.     Denial of Defendant's Motion to Suppress the Results of the Blood Test

Defendant contends that the trial court erred in denying his motion to suppress the results of the blood test. We disagree.

#### 1.     Standard of Review

A challenge to a trial court's ruling denying a motion to suppress typically presents a mixed question of law and fact that is subject to a two-tier standard of review. (*People v. Boulter* (2011) 199 Cal.App.4th 761, 767.) An appellate court reviews the trial court's resolution of the factual inquiry under the substantial evidence standard. (*People v. Harris* (2015) 234 Cal.App.4th 671, 681; *People v. Jones* (2014) 231 Cal.App.4th 1257, 1262 (*Jones*).) In determining whether the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*People v. Boulter, supra,* 199 Cal.App.4th at p. 767.)

---

[3]     The jury was deadlocked 11 to one in favor of guilt.

11

## 2. *Applicable Law*

The Fourth Amendment to the United States Constitution guarantees freedom from unreasonable search and seizure. (U.S. Const., 4th Amend.; U.S. Const., 14th Amend.; *People v. Rogers* (2009) 46 Cal.4th 1136, 1156.) Evidence obtained in violation of this right is inadmissible in a criminal trial. (*Mapp v. Ohio* (1961) 367 U.S. 643, 654-655.)

A warrantless search and seizure is presumptively unreasonable under the Fourth Amendment. The government, therefore, bears the burden of establishing that exigent circumstances or another exception to the warrant requirement justified the search. (*People v. Boulter*, *supra*, 199 Cal.App.4th at p. 768.)

"'The touchstone for all issues under the Fourth Amendment and article I, section 13 of the California Constitution is reasonableness. [Citations.]' (*Ingersoll v. Palmer* [(1987)] 43 Cal.3d [1321,] 1329.) 'The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.' (*Bell v. Wolfish* (1979) 441 U.S. 520, 559 [60 L.Ed.2d 447, 99 S.Ct. 1861].) "Reasonableness . . . is measured in objective terms by examining the totality of the circumstances" [citation], and "whether a particular search meets the reasonableness standard '"is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."'" [Citations.]' (*People v. Robinson* (2010) 47 Cal.4th 1104, 1120 [104 Cal.Rptr. 3d 727, 224 P.3d 55]; see *Bell v. Wolfish*, *supra*, 441 U.S. at p. 559 ['Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'].)" (*People v. Boulter*, *supra*, 199 Cal.App.4th at p. 768.)

## 3. *Relevant Facts and Proceedings*

Defendant filed a motion to suppress the results from a blood draw taken from him at the hospital, arguing that his blood draw was unconstitutional because it was not consensual and it was obtained without a warrant. The prosecutor opposed the motion.

12

At the hearing on defendant's motion, which hearing occurred before both the first and second trials, Deputy Munoz testified about facts giving rise to the fatal accident and defendant's behavior. Deputy Munoz opined, based on his training and experience, and defendant's behavior, that at the time of the accident, defendant was under the influence of a controlled substance, such as PCP or a hallucinogenic. According to Deputy Munoz, it takes approximately nine hours for PCP to exit the human body.

Defendant was treated at the scene of the accident by paramedics for approximately 30 minutes, and was transported to the hospital. Wozniak-Smith, the phlebotomist at Antelope Valley Hospital, testified that on December 6, 2012, defendant was brought to the hospital and placed in a room. She heard defendant "hooting and hollering, yelling and screaming names and such." Less than five minutes after defendant arrived at the hospital, Wozniak-Smith entered defendant's room, and two deputies were already in the room. Defendant was "fighting and yelling and screaming."

Defendant was considered a "trauma" patient because he was involved in a vehicle accident. He was at the hospital for medical treatment.

Wozniak-Smith was instructed by hospital personnel to perform a blood draw from defendant; she asked the deputies if they needed a legal blood draw, and they told her they did. The hospital preferred to draw blood prior to any medications being administered so that the results would be accurate and not altered by the medications.

Prior to drawing the blood, Wozniak-Smith advised defendant that she was going to draw his blood, and he told her "he didn't fuckin' care." Wozniak-Smith agreed with defendant's counsel on cross-examination that defendant did not really consent to the blood draw. Because defendant was "flailing his arms around," four people held down defendant while Wozniak-Smith did both blood draws on defendant. Wozniak-Smith was scared of defendant at that time.

Deputy Cisneros arrived at the hospital, and was told by Deputy Smith that the blood draw had already been completed. Deputy Cisneros had not attempted to obtain a warrant for the blood draw, and Smith had not said she had obtained a warrant. Deputy

Munoz testified that he was not certain if there was any attempt to obtain a warrant for defendant's blood.

At the hearing, defendant's counsel contended that the deputies should have obtained a warrant by telephone prior to drawing defendant's blood. Defendant's counsel argued that exigent circumstances did not exist because Deputy Munoz testified that it took nine hours for PCP to exit the body.

The prosecutor conceded that no warrant had been obtained in the case. The prosecutor however argued that exigent circumstances did exist because even if it took nine hours for PCP to entirely leave the body, "there's a dissipation and a metabolism of the substance going on during that entire period." The prosecutor also argued that a blood draw needed to be taken before any medications were administered so that a "true reading" of defendant's blood could be obtained, and it was objectively reasonable for an officer to believe that an exigency existed to obtain the blood prior to any medication being given to treat defendant's combativeness or his injuries.

The trial court stated that the fatal accident occurred before the amendment of the Penal Code that added "a section which included blood draws in DUI's"; and a warrant was not "as readily accessible" as the defendant argued in *Missouri v. McNeely* (2013) 569 U.S. __ [133 S.Ct. 1552] (*McNeely*). The trial court found that defendant's statement, "I don't give a fuck," did not "really" impose an objection to the blood draw. The trial court also found that exigent circumstances existed for the blood draw because Wozniak-Smith had testified that the hospital performed blood draws prior to any treatment so that medication would not taint the blood results; defendant's "combative nature" was endangering law enforcement and the phlebotomist; and because defendant's behavior was not "deescalating by any stretch of the imagination," the passage of time would only compound the danger to the hospital staff and the officers.

The trial court also stated that there was no testimony regarding what time the PCP was supposedly ingested and therefore there was no indication regarding when the nine hours would have elapsed; defendant had not posed an objection to the blood draw; disagreed that an advisement was required under the circumstances because defendant

14

had been transported to the hospital for medical treatment and in a "combative state," and therefore it was "just not practicable" to bring defendant to a Sheriff's station to attempt a breath test. The trial court added that because the hospital staff was obligated to give defendant medical treatment, any breath test would have resulted in a "significant delay." The trial court denied the suppression motion.

Defendant renewed his suppression motion prior to the second trial, and the trial court informed the parties that its prior ruling stood. After jury selection, defendant again made his suppression motion, and the trial court denied the motion for the same reasons it had previously stated.

### 4. Analysis

In *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*), the United States Supreme Court held that a warrantless drawing of blood from an intoxicated suspect was justified due to the alcohol in the blood stream dissipating, so there was not time to obtain a warrant because evidence would, in effect, be destroyed. In *McNeely, supra,* 133 S.Ct. 1552, decided after *Schmerber* and after the blood draw in this case, the United States Supreme Court held that while the dissipation of alcohol was a factor to consider, it alone did not constitute an exigent circumstance to justify a warrantless blood draw in every case. (*Id.* at 133 S.Ct. 1568.)

It has been held that suppression under *McNeely, supra,* 133 S.Ct. 1552, is not required when, as here, there was a good faith search made pursuant to binding authority and prior to *McNeely*. (*Jones, supra,* 231 Cal.App.4th at pp. 1263-1265; see *Davis v. United States* (2011) 564 __ U.S. __ [131 S.Ct. 2419] [exclusionary search rule does not apply when there is reasonable reliance on binding appellate precedent].)[4] Prior to *McNeely*, the binding judicial precedent in this state interpreted *Schmerber* to allow

---

[4]     The Supreme Court granted review in *People v. Macabeo*, S221852, in which the Court of Appeal held that a warrantless search of data on an arrestee's telephone in conformity with existing state law and before a contrary United States Supreme Court opinion, was within the good faith exception to the exclusionary rule.

warrantless blood draws for intoxicated suspects incident to a valid arrest. (*Jones, supra,* 231 Cal.App.4th at p. 1265.) The nonconsensual warrantless blood test was valid under the theory that *McNeely* did not apply in this case.

The blood test was also valid under *McNeely, supra,* 133 S.Ct. 1552, because there was evidence of the case-specific exigent circumstances required by *McNeely*. Deputy Munoz suspected that defendant was under the influence of PCP and testified that it takes approximately nine hours for PCP to exit the human body. There is no evidence that the officers knew at the time defendant was at the hospital when defendant ingested the PCP. In addition, it is reasonable to infer that the officers were prevented from discovering when defendant ingested the PCP because of defendant's combativeness and refusal to cooperate. (*People v. Toure* (2015) 232 Cal.App.4th 1096, 1105.) Among other things, the time it took to render aid to defendant at the scene of the accident, transport defendant to the hospital, and subdue defendant, threatened the destruction of the evidence.

Defendant was taken to the hospital after having been involved in a fatal accident, and was considered by the hospital as "trauma" patient; he was in need of medical treatment. While at the hospital, he was violent and presumably would benefit from medication. Under the circumstances, defendant needed to be treated and likely administered medication as soon as possible. The phlebotomist testified that the hospital preferred to draw blood prior to any medications being administered so that the results would be accurate and not altered by the medications. Time was of the essence therefore in obtaining the blood draw.

Defendant contends that "[t]he only factual basis [that defendant's blood had to be drawn before he was given any medication] was the testimony of the phlebotomist that a blood draw was necessary before patients were administered any type of medication," and that "was not a valid legal reason for finding an emergency situation because, as the trial court itself recognized, the phlebotomist was not a doctor or nurse." Defendant, however, did not object to the phlebotomist's testimony that a blood draw was necessary before patients were administered any type of medication. Defendant therefore forfeited

16

this contention.  (Evid. Code, § 353, subd. (a); *People v. Dowl* (2013) 57 Cal.4th 1079, 1087.)

Defendant contends that there was no expert testimony that the medication required by defendant would have contaminated the result.  That argument, however, assumes that at the time of the blood draw, it had been determined what medication was necessary and appropriate.  There is no evidence that before the blood draw a medical doctor treated defendant and made a determination as to what medication was necessary and appropriate.  In any event, it was objectively reasonable for the deputies to believe that the exigencies of the situation made it necessary to obtain defendant's blood before the evidence was contaminated.

Moreover, because defendant was combative and did not appear to be de-escalating his combative behavior, it was reasonable for the officers to conclude that any delay in obtaining a warrant might make it more difficult to obtain a blood draw later due to the possibility of more difficult behavior by defendant later on.  The case-specific exigent circumstances support the trial court's decision that the warrantless blood draw in this case was justified.

## B.     Admission into Evidence of Drug Recognition Expert

Defendant contends that Officer Wupperfeld, the prosecutor's DRE, was not qualified to testify about whether defendant was able to make decisions about operating a vehicle, and his counsel was ineffective for failing to object to the testimony on proper grounds.  We disagree.

### 1.     *Relevant Facts and Proceedings*

As noted above, Vidal, a senior criminalist, testified about PCP and its possible effects.  Vidal testified that there were "field certified" DREs who "evaluate drivers," but Vidal was not a field certified DRE.

17

Defendant's counsel subsequently objected to the proposed testimony of a DRE on the grounds of relevance and under Evidence Code section 352. The trial court allowed the testimony, finding it "highly relevant."

Officer Wupperfeld, the prosecutor's DRE expert, testified regarding his qualifications. Officer Wupperfeld had been a California Highway Patrol officer for over 11 years, and a DRE for almost 10 years. While attending the California Highway Patrol Academy, he underwent classroom instruction focusing on driving under the influence of alcohol (DUI) and drug investigations. Officer Wupperfeld spent five years in the California Highway Patrol's central Los Angeles office, where he conducted approximately 1,200 DUI investigations that resulted in an arrest, and 3,000 total DUI investigations. After becoming a DRE in 2005, Officer Wupperfeld conducted about 72 DRE evaluations and assisted in 130 such evaluations. During his time in the central Los Angeles office, Officer Wupperfeld also would train new DRE candidates. Officer Wupperfeld also was assigned to the California Highway Patrol's Antelope Valley office for six years, during which time he conducted approximately 360 DUI investigations that resulted in an arrest, and 720 total DUI investigations.

During his career, Officer Wupperfeld had conducted more than 1,000 DRE evaluations, including having personal experience with people on Skid Row who submitted to DRE examinations in exchange for hamburgers. He "contacted thousands of individuals who [were] under the influence of drugs, interviewed them, evaluated them, [and] learned from them"; and had "a large body of experience teaching, doing evaluations in the field, in patrolling, also learning in the classroom and doing [his] own research."

Officer Wupperfeld testified that he was not a doctor or a nurse, but he was unaware of any doctor or nurse going into the field and testing people who were under the influence of PCP. Officer Wupperfeld had EMT training and used this training within his DRE expertise.

Officer Wupperfeld was familiar with the Glasgow scoring procedure and the "alert and oriented times three" procedure. Both procedures are assessments of whether a

18

person is "conscious, alert and oriented enough to function at a normal level"—whether the person is "capable of making decisions."

Although Officer Wupperfeld was not involved in the investigation of defendant's case, he conducted a review of the police reports, prior testimony, charts, diagrams, and sketches related to the case. Officer Wupperfeld was given a series of hypothetical questions based on the evidence in the case regarding defendant's behavior during the incident. He said in his opinion that the behaviors described would be consistent with a person being under the influence of PCP. After being given an additional series of hypothetical questions that recounted the evidence in the case regarding defendant's conduct during the incident, Officer Wupperfeld said in his opinion that the conduct showed that the person was capable of making decisions. Officer Wupperfeld explained that people under the influence of PCP might be more likely to make bad decisions, but that did not mean "they're not capable of making a decision."

During cross-examination of Officer Wupperfeld, defendant's counsel established that Officer Wupperfeld had not taken any graduate courses or medical courses on how PCP affected the brain, had not written any peer-reviewed articles about how PCP affected the brain, and had no graduate medical training. He admitted that he had not met defendant prior to trial and had not evaluated defendant on December 6, 2012, the day of the collision, regarding his being under the influence of PCP.

During closing argument, defendant's counsel argued that Officer Wupperfeld's testimony "was outside his area of expertise. His expertise was in the observation of people under the influence of PCP; not on the most complicated part of the human anatomy. The Human Brain. He wasn't qualified to testify on how PCP affects the human brain. He had done no such research. He did not go to school for it."

19

### 2. *Analysis*

#### a) Officer Wupperfeld's Qualifications

Although defendant's counsel objected to Officer Wupperfeld's testimony on the grounds of relevance and under Evidence Code section 352, defendant's counsel failed to object to Officer Wupperfeld's testimony on the grounds that he was not qualified to testify about whether a person under the influence of PCP was capable of making decisions. Defendant therefore forfeited this contention. (Evid. Code, § 353, subd. (a); *People v. Dowl*, *supra*, 57 Cal.4th at p. 1087 ["We have long and repeatedly held that a defendant who fails at trial to object that a witness lacks the qualifications to render an expert opinion may not on appeal contest the opinion's admissibility. [Citations.]"].)

Even if the issue was not forfeited, defendant would not prevail on the merits. Officer Wupperfeld's challenged testimony was properly admitted.

Evidence Code section 720, subdivision (a) provides, "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." "[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony." (*People v. Hogan* (1982) 31 Cal.3d 815, 852, disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)

Police officers with significant "training in and experience with narcotics" have been qualified as "expert[s] in the field of narcotics." (*People v. Wesley* (1990) 224 Cal.App.3d 1130, 1135, 1146 [holding that a police officer was properly qualified as an expert in the field of narcotics and could give opinion testimony that a solid substance involved in an undercover transaction was cocaine when he had attended two 40-hour narcotics training courses, had experience writing search warrants for cocaine violations and making arrests, and had experience purchasing and selling cocaine undercover].) """"Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the

20

weight of the evidence than its admissibility."' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322.)

A trial court's decision as to the qualifications of an expert witness is within the court's broad discretion and will not be overturned on appeal unless the defendant shows "a manifest abuse of that discretion." (*People v. Jones* (2013) 57 Cal.4th 899, 949.) The trial court errs if "'the evidence shows that a witness *clearly lacks* qualification as an expert and the judge has held the witness to be qualified as an expert witness.' [Citation.]" (*People v. Hogan, supra,* 31 Cal.3d at p. 852.)

Officer Wupperfeld testified that he had extensive experience performing and teaching drug recognition evaluations; underwent EMT training and used this training within his DRE expertise; was aware of the Glasgow scoring system and the "alert and oriented times three" procedure; "contacted thousands of individuals who [were] under the influence of drugs, interviewed them, evaluated them, learned from them;" and had "a large body of experience teaching, doing evaluations in the field, in patrolling, also learning in the classroom and doing [his] own research."

Defendant contends that Officer Wupperfeld lacked medical training to give an opinion on whether a person under the influence of PCP was capable of making decisions. There however is nothing to show that such training was necessarily needed to answer the prosecutor's hypothetical questions. Indeed, although Officer Wupperfeld was not a doctor or a nurse, he testified that he was not aware of any doctor or nurse who went into the field and tested people who were under the influence of PCP. By contrast, Officer Wupperfeld testified, for example, that he had personal experiences with people on Skid Row who submitted to DRE examinations in exchange for hamburgers. In any event, Officer Wupperfeld testified that he underwent EMT training and used this training within his DRE expertise.

Defendant contends that Officer Wupperfeld's testimony was speculative because he had not interviewed defendant and there was no evidence of defendant's medical history or any psychological testing of defendant. Defendant reasons therefore that Officer Wupperfeld could not testify as to defendant's ability to make decisions. As to

21

Officer Wupperfeld's challenged testimony, however, he did not to give an opinion about defendant's ability to make decisions. He merely testified about a hypothetical person's ability to make decisions.

The challenged testimony of Officer Wupperfeld was properly admitted. Any issue regarding the degree of his knowledge goes to the weight of his testimony and not its admissibility. (*People v. Bolin*, *supra*, 18 Cal.4th at pp. 321-322.)

b) Ineffective Assistance of Counsel

Defendant contends that his attorney provided ineffective assistance by not objecting to the challenged portion of Office Wupperfeld's testimony. Defendant did not establish that his counsel provided ineffective assistance.

A defendant who contends that his attorney was ineffective must show the attorney's representation was below the standards under prevailing professional norms, and a different result was reasonably probable in the absence of the deficient performance. (*People v. Johnson* (2015) 60 Cal.4th 966, 979-980.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) "The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel. [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.)

The record on appeal does not reveal the reason why defendant's counsel did not object to any of the testimony of Officer Wupperfeld on the ground that he was not qualified to testify about it. For the reasons discussed above, defendant's counsel might have refrained from objecting because he realized that an objection was likely to be overruled. Instead, the record on appeal establishes that counsel chose instead to cross-examine Officer Wupperfeld on his qualifications and argue to the jury that Officer

22

Wupperfeld was not qualified to testify. There is no way of determining why defense counsel failed to object on the ground that Officer Wupperfeld was not qualified to testify about any particular subject matter. Accordingly, any claim of ineffective assistance with respect to the claimed deficiencies is better suited to a petition for writ of habeas corpus. (*People v. Anderson*, *supra*, 25 Cal.4th at p. 598; *People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 267.)

**C.     The Trial Court's Refusal to Advise the Jury That Defendant Had Been Convicted of Gross Vehicular Manslaughter in the First Trial**

Defendant contends that the trial court erred when it refused to advise the jury that he had been convicted of gross vehicular manslaughter in the first trial. The trial court did not err.

*1.     Relevant Facts and Proceedings*

Prior to the second trial, defendant's counsel requested that the jury be informed of defendant's conviction for gross vehicular manslaughter in the first trial, relying on *People v. Batchelor* (2014) 229 Cal.App.4th 1102 (*Batchelor*). The trial court refused the request and told the prosecution he could not argue to the jury that if defendant was not convicted of murder, "he's walking out of that door."

Defendant renewed his motion during a discussion on the jury instructions. The trial court denied the motion. Prior to closing argument, the trial court said that defendant's counsel could argue that the elements of murder had not been met. The trial court told defendant's counsel, however, that he was not allowed to identify other possible charges because he was limited to the evidence presented and the instructions given, and the trial court did not want to confuse the jury with issues that were not before it.

### 2. Analysis

Citing *Batchelor, supra*, 229 Cal.App.4th at pages 1116 through 1118, defendant contends that the trial court erred when it refused to advise the jury that he had been convicted of gross vehicular manslaughter in the first trial. In *Batchelor,* as here, at the first trial the defendant was convicted of gross vehicular manslaughter, but the jury could not reach a verdict as to the murder charge. Also, as here, at the second trial the defendant was convicted of murder. The court in *Batchelor* held that the trial court committed reversible error because it did not advise the jury in the second trial that he had been convicted of gross vehicular manslaughter in the first trial. (*Id.* at pp. 1116-1117.) The court reasoned that the failure to so advise the jury gave it the "false impression" that the defendant would be "unpunished" if he was not convicted of murder. (*Ibid*.)

*Batchelor, supra*, 229 Cal.App.4th 1102 is distinguishable from the facts here. In that case, the court suggested that its decision was based on "the unusual circumstances of this case." (*Id.* at p. 1117.) The decision in *Batchelor* was premised, in part, on the prosecutor's closing argument that the jury should "hold [the defendant] accountable" and "send the message that [if] you drink and drive and kill someone, you're going to be held accountable. There is only one count in this case that you have to decide on. This is it. Hold him accountable for killing someone." (*Ibid*.) The court in *Batchelor* explained that this "argument certainly created the misleading impression that unless the jury found him guilty of the murder charge, he would not be held accountable at all for [the victim's] death." (*Ibid*., fn. omitted.) Here, in contrast, the prosecutor made no such argument, and the trial court specifically told the prosecutor to avoid making such an argument.

To the extent *Batchelor, supra*, 229 Cal.App.4th 1102 holds that a trial court must always advise a jury in a second trial that the defendant was convicted of a lesser related crime in the first trial, we disagree with such a conclusion. *Batchelor* did not cite any case or statutory law supporting that conclusion. (*Id.* at pp. 1116-1117.) Our Supreme Court has stated in a different context that it has "never suggested that the trial court is required to inform the jury of the history of the prior proceedings." (*People v. Edwards*

24

(1991) 54 Cal.3d 787, 845; see also *People v. Burgener* (2003) 29 Cal.4th 833, 867 [quoting *People v. Edwards*]; *People v. Wash* (1993) 6 Cal.4th 215, 254 [quoting *People v. Edwards*]; cf. § 1180 [after granting of a new trial "the former verdict or finding cannot be used or referred to"].)  Moreover, a trial court must refrain from instructing the jury on matters that are irrelevant to the issues raised by the evidence, and those that have the effect of confusing the jury.  (*People v. Alexander* (2010) 49 Cal.4th 846, 920; see *People v. Ledesma* (2006) 39 Cal.4th 641, 733 [sentence received at another trial not relevant].)  A conviction in a first trial is irrelevant in the second trial.

If the requested advisement was intended to inform the jury that defendant would be punished even if they acquitted him, that advisement would be improper because "[a] defendant's possible punishment is not a proper matter for jury consideration.  (*People v. Honeycutt* (1977) 20 Cal.3d 150, 157, fn. 4 [141 Cal.Rptr. 698, 570 P.2d 1050].)" (*People v. Holt* (1984) 37 Cal.3d 436, 458.)  CALCRIM No. 706 states, "In your deliberations, you may not consider or discuss penalty or punishment in any way when deciding whether a . . . charge[] has been proved."

The only issue before the second jury was whether defendant was guilty of second degree murder.  The issue of defendant's guilt of gross vehicular manslaughter was not before the second jury.  As the court in *Batchelor, supra*, 229 Cal.App.4th 1102 correctly noted, "Gross vehicular manslaughter is a lesser related but not a lesser included offense of second degree murder."  (*Id*. at p. 1116, citing *People v. Sanchez* (2001) 24 Cal.4th 983, 991, overruled on another ground in *People v. Reed* (2006) 38 Cal.4th 1224, 1228-1229.)[5]  A trial court is not required to give an instruction on a lesser related offense. (*People v. Birks* (1998) 19 Cal.4th 108, 116, 124, 128; see also *People v. Rundle* (2008) 43 Cal.4th 76, 147-148 ["there is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn 22.)

---

[5]     Had the conviction in the first trial been for a lesser included offense, defendant could not have been retried.  (*People v. Fields* (1996) 13 Cal.4th 289, 296, 305, 312.)

Instructing or otherwise advising the jury that defendant had previously been convicted of gross vehicular manslaughter reasonably could cause the jury to focus on irrelevant matters rather than focusing on the issue before it—whether the prosecutor proved that defendant had committed a second degree murder beyond a reasonable doubt. In many cases, advising the second jury that defendant had been convicted of a lesser related crime in the first trial regarding the same incident involved in the second trial could prejudice defendant; so advising the second jury may signal to it that defendant was culpable or that it should determine certain facts adverse to defendant. In addition, advising the jury as to a result in the first trial might induce the jury to speculate on its ramifications. The result of the first trial might influence the jury to assume that the jury for that trial could not come to a conclusion as to the murder charge, and draw an inference from that assumption.

Even if the trial court erred in refusing to advise the jury that defendant had been convicted of gross vehicular manslaughter in the first trial, the error was harmless under the standard in either *People v. Watson* (1956) 46 Cal.2d 818, 836 through 837 (more favorable outcome for defendant reasonably probable absent error), or *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt). The evidence in the second trial of defendant's guilt of murder, including implied malice, was overwhelming. There was evidence that defendant knew driving while under the influence of alcohol or drugs was dangerous to human life, ingested PCP on the day of the incident, "made [the] decision" to drive his vehicle, drove erratically, and collided with another vehicle killing a two-year-old child. The child died because she suffered fractured and separated vertebrae causing a "functional decapitation." That the first trial ended with the jury being hung on the murder charge is not compelling in this case, because the presentation of evidence in the two cases was different.[6]

---

[6] See *People v. Soojian* (2010) 190 Cal.App.4th 491, 520 ["Other cases have found it persuasive that the first trial ended in a hung jury when deciding whether the error that occurred in the retrial was prejudicial. [Citations.]"]

**DISPOSITION**

The judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**

                                                      MOSK, J.

We concur:

        TURNER, P. J.

        BAKER, J.